UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Margaret Trefethen,
      Plaintiff

      v.                                    Case No. 11-cv-225-SM
                                            Opinion No. 2013 DNH 081
Liberty Mutual Group, Inc.,
      Defendant

## O R D E R

     Plaintiff, Margaret Trefethen, brings this action against
her former employer, Liberty Mutual Group, claiming it unlawfully
terminated her employment and then coerced her into signing a
release of claims.  She says the release is unenforceable, and
she seeks damages for alleged acts of discrimination and wrongful
termination.  Liberty Mutual moves for summary judgment on each
of Trefethen's claims, as well as on each of its own
counterclaims.

     Contemporaneous with the issuance of this order, the court
has issued its decision in a related case involving Liberty
Mutual.  See Bryant v. Liberty Mutual Group, Inc., 2013 DNH 77
(D.N.H. May 31, 2013).  The claims raised in this case, as well
as the arguments advanced to invalidate the release, are
substantially similar to those advanced in Bryant.  In fact,
Trefethen and Bryant are represented by the same counsel.  While

some of the background facts in the two cases obviously differ, those factual differences are not material.  Because the governing legal principles, as well as the court's reasoning, are the same, they need not be repeated at length in this decision.

For the reasons set forth below, as well as those discussed more fully in <u>Bryant</u>, Liberty Mutual's motion for summary judgment is granted with respect to each of Trefethen's claims. Liberty Mutual's counterclaims are, however, dismissed as moot.

## Standard of Review

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  <u>Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

2

**Background**

Trefethen worked for Liberty Mutual for about 16 months in the early 1980's and returned in 2001.  During the course of her employment, she received several promotions.  By 2008, she had risen to the position of Treasury Services Specialist in the Cash Controls Unit.  But, she says that upon her promotion to that position, Liberty Mutual began making "unreasonable and impossible demands" on her.  Plaintiff's Memorandum (document no. 31-1) at 2.  And, says Trefethen, her supervisor began to question whether she had the "energy and ability" to perform her job - language Trefethen suggests was code for age-related discrimination.  Id.  As a result of the job-related stress, Trefethen says she developed shingles, was out of work for a period of time, and filed a Workers' Compensation claim.  Yet, she says, "[e]ven after learning that Trefethen had shingles due to stress, [her supervisor] continued to insist that Trefethen handle an impossible work load."  Id.

In March of 2009, Trefethen's direct supervisor left (or was fired by) the company and Trefethen was told that she would be assuming even greater job responsibilities.  She claims Liberty Mutual "continued to simply increase [her] work load so she couldn't possibly keep up."  Id. at 3.  In August of 2009, Trefethen received a verbal warning based upon Liberty Mutual's

perception that she was not adequately performing her job.  In a subsequent meeting with a representative of the human resources department, Trefethen claims she was told that, in essence, the company was setting in motion a plan to fire her.  She says she learned that the company's plan would unfold as follows.  In the wake of the verbal warning, she would inevitably receive a written warning in 30 days.  Then, 30 days later, she would be put on probation and, 30 days after that, her employment would be terminated.  Trefethen Deposition (document no. 30-5) at 91.  She claims she understood (although she admitted that no one specifically told her) that "the die was cast at that point" and there was no opportunity for her to improve or otherwise avoid being fired.  Id. at 91-92.

After she received the warning about her performance, Trefethen worked toward meeting the demands that had been placed upon her.  But, she says she soon realized that she had been tasked with meeting unreasonable expectations and was incapable of doing so.  Then, at some point in September of 2009, she says the human resources representative informed her that she had three options: first, she could simply quit, but that would preclude her from collecting unemployment benefits; second, she could wait for what she believed was inevitable disciplinary action, after which she assumed she would be discharged for cause

- again, precluding her from receiving unemployment benefits; or, finally, she could enter into a "mutual separation agreement" with Liberty Mutual.  The advantage of such an agreement was that she would be eligible to receive unemployment benefits, as well as severance benefits.  See id. at 94.  She told the human resources representative that she would think about it and discuss her options with her husband.  Id.

Subsequently, Trefethen contacted human resources and asked how she would go about pursuing the mutual separation agreement. She learned that she would be eligible for severance benefits if she signed an agreement releasing any legal claims she might have against Liberty Mutual.  Over the next few days, Trefethen communicated (both orally and by e-mail) with representatives of the human resources department and asked a number of questions about the proposed mutual separation.  She also asked if Liberty Mutual would allow her to continue working through October 30, 2009, so she might reach her 10-year service anniversary - a milestone that would allow her to receive additional benefits upon her departure.  Id. at 96.  Liberty Mutual agreed.

On September 20, 2009, Trefethen notified Liberty Mutual that she would like to pursue the "mutual separation" proposal, with her final day of work being October 30 (at the same time,

however, Trefethen was pursuing two other job openings within the Liberty Mutual organization).  A few days later, Liberty Mutual sent her a letter, confirming the arrangement and explaining that she would receive payment for all accrued but unused vacation time and personal holidays; she was eligible for insurance benefits under COBRA; if she wished to be eligible for severance benefits, she would have to execute a release of claims against Liberty Mutual; and the decision to sign the release and accept severance pay is entirely voluntary.  See Letter from Valencia Augusta to Margaret Trefethen dated September 23, 2009 (document no. 30-8) ("Your decision to accept or reject this additional separation consideration is entirely voluntary and will in no way affect your receipt of the regular benefits outlined above (i.e., salary and vacation pay and group benefits)."

On or around October 30, Trefethen received the release of claims.  Among other things, that agreement provided that she:

1. Acknowledged that, absent her signature to the agreement, she was not entitled to severance benefits;

2. Knowingly and voluntarily released any claims she might have against Liberty Mutual as of the date of the agreement, including more than 20 specifically identified state and federal statutory and common law claims;

3. Had not relied upon any representations, promises, or agreements outside of those set forth in the severance agreement itself;

4.   Had 45 days within which to review, consider,
     and sign the agreement;

5.   Had been advised to consult with an attorney
     prior to signing the agreement; and

6.   Had an additional seven days <u>after</u> signing
     the agreement to rescind it.

<u>See</u> Severance Agreement and General Release ("Severance
Agreement") (document no. 30-3). She reviewed the document,
discussed it with her husband, and, on November 4, 2009, she
signed it and returned it to Liberty Mutual. She did not rescind
the agreement within the seven-day period provided to her.
Accordingly, Liberty Mutual paid her all severance benefits to
which she was entitled. The last payment was made on February
12, 2010. More than a year later - on March 29, 2011 - Trefethen
brought this action against Liberty Mutual, seeking to invalidate
the Severance Agreement and obtain damages for what she claims
was the unlawful termination of her employment.


                          **Discussion**

     In her seven-count complaint, Trefethen advances claims of
"constructive discharge," wrongful termination, fraud, undue
influence, fraudulent misrepresentation, negligent
misrepresentation, and "enhanced compensatory damages." In
short, she asserts that because the Severance Agreement is not
enforceable, it does not bar her efforts to obtain compensation

                              7

for Liberty Mutual's allegedly unlawful conduct surrounding her separation from the company.  But, if that contract is valid and enforceable, it plainly bars each of her claims against Liberty Mutual.

In support of her assertion that the Severance Agreement is not enforceable, Trefethen raises two arguments.  First, she claims Liberty Mutual coerced her, under duress, to sign the agreement.  Consequently, she says she did not "knowingly and voluntarily" release her legal claims against Liberty Mutual. Next, she says she justifiably relied upon material, fraudulent misrepresentations made to her by Liberty Mutual's agents about the legal scope and effect of the Severance Agreement.  As a result, says Trefethen, she was fraudulently induced to sign the Severance Agreement and Liberty Mutual is precluded from enforcing it against her.

In brief, the court holds that, as a matter of law, Trefethen has not demonstrated that the Severance Agreement is unenforceable against her on grounds that her signature was obtained through fraud, coercion, or under duress.

I.   <u>Knowing and Voluntary Release of Claims</u>.

Unlike the plaintiff in <u>Bryant</u>, Trefethen does not advance any claims under the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefit Protection Act, 29 U.S.C. § 626(f) ("OWBPA").  Nevertheless, because the OWBPA was enacted to ensure that an employee's release of employment-related claims is made both knowingly and voluntarily, a brief discussion of that statute (and why the Severance Agreement meets each of its requirements) is probably useful.

In 1990, Congress enacted the OWBPA to resolve a split among the circuits over how to properly determine when an employee's waiver of rights under the ADEA was knowing and voluntary.  <u>See American Airlines, Inc. v. Cardoza-Rodriquez</u>, 133 F.3d 111, 117 (1st Cir. 1998).  Under the OWBPA, for an employee's waiver of ADEA claims to be "knowing and voluntary," the release must meet certain minimum requirements:

1.   It must be written in a manner calculated to be understood by the employee signing the release, or the average individual eligible to participate;

2.   It must identify the claims being released and specifically reference the ADEA;

3.   It must not purport to encompass claims that may arise after the date of signing;

4.   The employer must provide consideration for the release above and beyond that to which the employee would otherwise already be entitled;

9

5.     The employee must be advised in writing to consult
       with an attorney prior to executing the agreement;

6.     The employee must be given at least 21 days to
       consider signing the release (that period is
       extended to 45 days if the incentive is offered to
       a group or class of employees); and

7.     The release must allow the employee to rescind the
       agreement for up to 7 days after signing.

See 29 U.S.C. § 626(f)(1)(A)-(G).


In this case, Liberty Mutual plainly drafted the Severance

Agreement with the requirements imposed by the OWBPA in mind.

Not surprisingly, then, it meets each of those requirements.  See

Bryant, 2013 DNH 77 at 10-12.  See also Pallonetti v. Liberty

Mutual, 2011 WL 519407, *4 (S.D.N.Y. Feb. 11, 2011) (concluding

that a substantially similar (if not identical) severance

agreement and general release drafted by Liberty Mutual met the

requirements of the OWBPA).  The Severance Agreement is written

in plain, easily understood language.  It expressly,

unambiguously, and unmistakably discloses that, by signing it,

Trefethen is forever waiving her right to bring any then-accrued

claims against Liberty Mutual, including a non-exhaustive list of

more than 20 specifically-identified state and federal causes of

action.  Then, in all capital letters, immediately above

Trefethen's signature, the Severance Agreement clearly provides

that:

10

> EMPLOYEE ALSO UNDERSTANDS THAT BY SIGNING THIS
> AGREEMENT, EMPLOYEE WILL BE WAIVING EMPLOYEE'S RIGHTS
> UNDER FEDERAL, STATE AND LOCAL LAW TO BRING ANY CLAIMS
> THAT EMPLOYEE HAS OR MIGHT HAVE AGAINST LIBERTY MUTUAL.
>
> EMPLOYEE HAS 45 DAYS TO CONSIDER THIS AGREEMENT.
> LIBERTY MUTUAL ADVISES EMPLOYEE TO CONSULT WITH AN
> ATTORNEY (AT EMPLOYEE'S EXPENSE) PRIOR TO SIGNING THIS
> AGREEMENT. . . . EMPLOYEE'S SIGNATURE BELOW CONSTITUTES
> EMPLOYEE'S ACKNOWLEDGMENT THAT EMPLOYEE HAS BEEN SO
> ADVISED, THAT EMPLOYEE HAS READ THE AGREEMENT, THAT
> EMPLOYEE FULLY UNDERSTANDS ITS TERMS, AND THAT EMPLOYEE
> KNOWINGLY AND VOLUNTARILY AGREES TO BE BOUND BY IT.

Id. at 4.


The fact that the Severance Agreement complies with each of the stringent requirements of the OWBPA certainly supports Liberty Mutual's assertion that Trefethen knowingly and voluntarily released all of her employment-related claims, in exchange for the severance benefits she received (and retained).


II.  Coercion, Duress, and Undue Influence.

Like the plaintiff in Bryant, Trefethen says Liberty Mutual forced her to choose from three options: allow the disciplinary process against her to proceed and face inevitable discharge for cause; voluntarily quit; or agree to the "mutual separation" proposed by Liberty Mutual and sign the Severance Agreement.  See Trefethen Deposition at 94.  Because she believed two of those choices were unpalatable, she asserts that Liberty Mutual coerced

her, under duress, into electing the third option: signing the
agreement and releasing her claims.  See id. at 115-17, 122.  For
that reason, she says the Severance Agreement is unenforceable.
She is incorrect.

To invalidate a contract on the basis of duress, "a party
must show that it involuntarily accepted the other party's terms,
that the coercive circumstances were the result of the other
party's acts, that the other party exerted pressure wrongfully,
and that under the circumstances the party had no alternative but
to accept the terms set out by the other party."  In re Yannalfo,
147 N.H. 597, 599 (2002) (citation omitted).  Because she says
she needed to preserve her ability to receive unemployment
benefits, Trefethen asserts that she had no alternative but to
accept Liberty Mutual's proposed "mutual separation agreement."
That, she says, amounted to unlawful coercion and/or duress,
sufficient to invalidate the Severance Agreement.  It did not.

That Trefethen was presented with difficult choices
surrounding her separation from Liberty Mutual - particularly
given her desire to receive both severance and unemployment
benefits - does not amount to coercion, nor does it mean that she
executed the Severance Agreement under duress.  The financial
stress associated with the loss of a job is not, without more,

sufficient to warrant the conclusion that an employee was acting under duress or a legal incapacity when she executed a release of claims.  See Melanson v. Browning-Ferris Indus., 281 F.3d 272, 277 (1st Cir. 2002).  "To hold otherwise would be to make it virtually impossible for employers and employees to enter into binding settlements of employment disputes occasioned by job losses, lay-offs and the like."  Id.

Moreover, like the plaintiff in Bryant, even if Trefethen had been able to establish that she signed the Severance Agreement under duress, she likely forfeited her ability to void the agreement on that ground by "failing to seek a remedy based on duress within a reasonable time after executing the [Severance Agreement]."  Vasapolli v. Rostoff, 39 F.3d 27, 35 n.5 (1st Cir. 1994) (citations omitted).  See also Keshishian v. CMC Radiologists, 142 N.H. 168, 173 (1997) ("While a contract that is the product of duress is voidable, it is well settled that a party cannot treat a contract as binding and as rescinded at the same time.  A contract made under duress will be deemed ratified if the aggrieved party fails to repudiate the agreement within a reasonable time after the duress has dissipated.") (citations and internal punctuation omitted).

For the foregoing reasons, as well as those discussed in Bryant, the Severance Agreement is neither void nor voidable on grounds that Liberty Mutual coerced Trefethen to sign it.  Nor is that agreement unenforceable on grounds that Trefethen was under duress when she signed it.

III. <u>Fraud in the Inducement</u>.

Finally, like the plaintiff in <u>Bryant</u>, Trefethen claims the Severance Agreement is not enforceable against her because she reasonably relied upon fraudulent misrepresentations made by agents of Liberty Mutual about the scope and legal effect of that contract.  Notwithstanding the plain language of the Severance Agreement, she says Liberty Mutual's agents assured her that she was <u>not</u> waiving her right to bring the sort of claims she advances in this case.  <u>See</u> Plaintiff's Memorandum at 5 ("Trefethen was specifically told by [Liberty Mutual's agents] that by signing the Severance Agreement she was not giving up any of her rights to bring a claim and that the language only protected Liberty if they did no wrong but that she could still sue Liberty if they violated any of her rights.").  Perhaps not surprisingly, Liberty Mutual denies that any such representations were made.

14

But, assuming Liberty Mutual's agents made such representations, it is not entirely clear that Trefethen actually relied upon them.  For example, when questioned about the specific language in the Severance Agreement discussing the waiver of any claims against Liberty Mutual, Trefethen responded as follows:

> Question:   Did you understand that you were, in fact, giving up all the claims that were enumerated in that column?
>
> Answer:     Yes.  I also understand that I was coerced into signing.
>
> Question:   No, just answer my question.
>
> Answer:     Okay.
>
> Question:   Did you understand that you were giving up all the claims that are enumerated in that column?
>
> Answer:     Yes.

Trefethen Deposition at 107.  See also, id. at 112 (explaining that she did not seek clarification of what she claims was ambiguous language in the Severance Agreement because she did not trust the human resources representative - at least implying that she was unlikely to rely upon any representations made by that person).  Nevertheless, even if Trefethen did actually rely upon those alleged fraudulent misrepresentations, such reliance was, as a matter of law, unjustifiable.

Under New Hampshire law, fraud in the inducement is a valid defense to a contract action and can be raised to void a contract.  See, e.g., Nashua Trust Co. v. Weisman, 122 N.H. 397, 400 (1982).  But, as the party seeking to invalidate the Severance Agreement on grounds of fraudulent inducement, Trefethen bears a substantial burden: she "must establish that the other party made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely upon it.  In addition, the party seeking to prove fraud must demonstrate justifiable reliance."  Van Der Stok v. Van Voorhees, 151 N.H. 679, 682 (2005) (citing Snierson v. Scruton, 145 N.H. 73, 77 (2000)) (emphasis supplied).

The standard of justifiable reliance "is not that of ordinary care, but an individual standard, based upon [plaintiff's] own capacity and knowledge."  Smith v. Pope, 103 N.H. 555, 559 (1961).  It is, in short, a subjective standard, rather than an objective "reasonable person" standard.  Consequently, Trefethen's educational level, intelligence, experience in the business world, and common sense are all relevant in determining whether reliance was justified.  As the United States Supreme Court has observed:

16

> [The] contrast between a justifiable and reasonable
> reliance is clear: "Although the plaintiff's reliance
> on the misrepresentation must be justifiable, this does
> not mean that his conduct must conform to the standard
> of the reasonable man.  Justification is a matter of
> the qualities and characteristics of the particular
> plaintiff, and the circumstances of the particular
> case, rather than of the application of a community
> standard of conduct to all cases."

Field v. Mans 516 U.S. 59, 70-71 (1995) (quoting Restatement

(Second) of Torts, § 545A, comment b).  See also Restatement

(Second) of Torts, § 541, comment a ("Although the recipient of a

fraudulent misrepresentation is not barred from recovery because

he could have discovered its falsity if he had shown his distrust

of the maker's honesty by investigating its truth, he is

nonetheless required to use his senses, and cannot recover if he

blindly relies upon a misrepresentation the falsity of which

would be patent to him if he had utilized his opportunity to make

a cursory examination or investigation.").


     For purposes of addressing Liberty Mutual's motion, the

court necessarily accepts that the human resources representative

actually made the statements Trefethen attributes to her -

statements that contradict the plain language of the Severance

Agreement.  It will also assume that Trefethen truly believed

that, despite signing the Severance Agreement, she was not

releasing any of the employment-related claims she now advances

against Liberty Mutual.  Still, Trefethen cannot, as a matter of law, prevail on her claim of fraudulent inducement.

As the court noted in <u>Bryant</u>, it is difficult to imagine a legal document that more clearly and unambiguously describes its purpose and legal effect than the severance agreement at issue in this case.  First, as discussed above, it complies with all of the strict requirements imposed by the Older Workers Benefit Protection Act - requirements that Congress imposed precisely to avoid disputes like this and to ensure that any waiver of employment-related legal claims was both knowing and voluntary. Moreover, the Severance Agreement includes the words "general release" in its title; it goes on to use the word "release" a total of 19 times; the word "waive" appears five times; it clearly provides that the employee "knowingly and voluntarily releases and forever discharges Liberty Mutual . . . from any and all claims, known or unknown;" it specifically lists numerous examples of the types of claims that are being released, including precisely the type of claims advanced by Trefethen; it unambiguously (and in capitalized typeface) states that the employee is being provided severance benefits <u>in exchange for</u> her agreement to release any and all legal claims against Liberty Mutual; and it makes clear that severance benefits are <u>only</u>

18

<u>available</u> if the employee signs the agreement and releases all
then-accrued legal claims.

If Trefethen's interpretation of the Severance Agreement
were legally correct, it would have little (if any) meaning or
relevance.  It is, then, difficult to understand why she thought
Liberty Mutual was giving her severance benefits, if not in
exchange for a complete release of claims.  Nor is it at all
clear why she believed Liberty Mutual was insisting that, to
receive those severance benefits, she must first execute the
agreement - an agreement that, given her interpretation of it,
would be essentially meaningless.

Trefethen obviously recognized that the Severance Agreement
had substantial legal significance.  She acknowledged that she
read it and understood that it provided 45 days within which to
review it, an additional seven days after signing within which to
revoke her assent, and that it specifically (and in capitalized
typeface) advised her to consult legal counsel before making any
decision to sign it.  <u>See, e.g.</u>, Trefethen Deposition at 119-22;
131-33.  Trefethen is well-educated and intelligent.  She holds
an Associate's Degree in Business Administration from The
University of Southern Maine, a Bachelor's Degree in Accounting
from Franklin Pierce University, and has been taking courses

19

toward a Master's Degree in Organizational Leadership.  She has worked in the accounting field since 1989, and was employed at Liberty Mutual for a number of years as an accountant - many of those years, she worked in a senior/supervisory capacity.  Given her high level of education and substantial experience in the business world, she must be presumed to understand the purpose of the bargained-for exchange represented by the Severance Agreement; in return for her waiver of all then-accrued legal claims and the elimination of any possible employment-related lawsuits, Liberty Mutual agreed to provide her with a valuable benefit that she very much desired: severance benefits.

In light of all those facts, Trefethen's asserted interpretation of the Severance Agreement is so plainly contrary to the clear language of the document that it is, as a matter of law, unreasonable.  To the extent she claims to have actually relied upon fraudulent assurances from the human resources representative to the effect that, despite signing the agreement, she could still bring employment-related claims against Liberty Mutual - even claims that the Severance Agreement specifically identifies as being waived - such reliance was patently unjustified.  See, e.g., Field, 516 U.S. at 70-71 (noting that reliance is not "justified" when, "under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and

intelligence from a cursory glance, or [she] has discovered
something which should serve as a warning that [she] is being
deceived.") (quoting W. Prosser, <u>Law of Torts</u>, § 108, p 718 (4th
ed. 1971)).  <u>See also</u> Restatement (Second) of Torts, § 541,
comment a ("Thus, if one induces another to buy a horse by
representing it to be sound, the purchaser cannot recover even
though the horse has but one eye, if the horse is shown to the
purchaser before he buys it and the slightest inspection would
have disclosed the defect."); <u>Pierce v. Atchison, Topeka and
Santa Fe Ry. Co.</u>, 65 F.3d 562, 569-70 (7th Cir. 1995) ("The
Illinois defense of fraudulent inducement also requires proof of
reasonable reliance, so cases discussing reasonableness in that
context are instructive to the resolution of our issue.
Fraudulent inducement is not available as a defense when one had
the opportunity to read the contract and by doing so could have
discovered the misrepresentation.") (citation omitted).

      For the foregoing reasons, as well as those set forth in
<u>Bryant</u>, Trefethen cannot, as a matter of law, show that she
justifiably relied upon the misleading representations allegedly
made by Liberty Mutual's human resources representative.
Consequently, she has not borne her burden of demonstrating that
she was fraudulently induced to sign the Severance Agreement.
The Severance Agreement is, therefore, valid and enforceable.

And, because Trefethen released all of the claims she seeks to pursue in this litigation, Liberty Mutual is entitled to judgment as a matter of law on all counts in her complaint.

## Conclusion

Trefethen's assertions that the Severance Agreement is not enforceable against her on grounds that her agreement to be bound by that document was obtained through fraudulent misrepresentations, duress, and/or coercion are not supported by the record.  Accordingly, for the reasons set forth above, as well as those discussed at greater length in Bryant, Liberty Mutual is entitled to judgment as a matter of law as to all claims advanced in Trefethen's complaint.

Liberty Mutual also seeks summary judgment on its three counterclaims: breach of contract (for having filed suit despite having signed the Severance Agreement); unjust enrichment (for having retained the severance benefits); and fraud (for having allegedly signed the Severance Agreement with no intention of actually honoring it).  That aspect of its motion is denied.  For the reasons discussed in Bryant, the court concludes that Trefethen is entitled to judgment as a matter of law on each of Liberty Mutual's counterclaims and/or that such claims are now moot.  See Bryant, 2013 DNH 77 at 27-28.

22

Accordingly, Liberty Mutual's Motion for Summary Judgment (document no. 30) is granted in part, and denied in part, as follows.  The motion is granted as to all counts in plaintiff's complaint.  As to Liberty Mutual's counterclaims, however, the motion is denied and those claims are dismissed.  In light of the foregoing, Liberty Mutual's Motion to Strike (document no. 33) is denied as moot, as are all of its pending motions in limine (documents no. 42, 43, 44, 45, 46, 47, 48, 49, 50, and 61).

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 31, 2013

cc:  John E. Lyons, Jr., Esq.
     Douglas J. Hoffman, Esq.
     Martha Van Oot, Esq.
     Debra W. Ford, Esq.
     K. Joshua Scott, Esq.

23